1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11                        ----oo0oo----

12   TINA CANUPP,                    CIV. NO. 2:14-01185 WBS EFB

13            Plaintiff,             MEMORANDUM AND ORDER RE: CROSS-
                                     MOTIONS FOR SUMMARY JUDGMENT
14       v.

15   CHILDREN'S RECEIVING HOME OF
     SACRAMENTO; and DOES 1 to 25,
16   inclusive,

17
              Defendant.
18

19                        ----oo0oo----

20   I.   Brief Factual and Procedural Background

21            Plaintiff Tina Canupp began working as the Health and

22   Wellness Manager for defendant Children's Receiving Home of

23   Sacramento ("CRH") on October 31, 2010.  In December 2013, she

24   experienced back pain and anticipated having back surgery.  To

25   accommodate this disability, she went on leave protected by the

26   Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, and

27   California Family Rights Act ("CFRA"), Cal. Gov't Code § 12945.2.

28   CRH calculated that her leave under the FMLA and CFRA would

                                   1

1    expire on January 11, 2014.  Because plaintiff could not resume
2    working by that date, CRH provided plaintiff with an additional
3    thirty days of personal leave.  When plaintiff did not return to
4    work at the expiration of her personal leave, CRH terminated
5    plaintiff.

6          Plaintiff initiated this action, alleging that CRH
7    failed to reasonably accommodate her disability and terminated
8    her when she was still entitled to FMLA and CFRA leave in
9    retaliation for her disability.  Plaintiff also alleges that CRH
10   terminated her in retaliation for reports she had made to the
11   California Department of Social Services, Division of Community
12   Care Licensing ("DSS") about alleged sexual misconduct by staff
13   at CRH.  In her Complaint, plaintiff alleges the following
14   claims: (1) disability discrimination in violation of subsection
15   12940(m) of California's Fair Employment and Housing Act
16   ("FEHA"), Cal. Gov't Code §§ 12940-12951; (2) failure to engage
17   in the interactive process in violation of subsection 12940(n) of
18   FEHA; (3) failure to provide reasonable accommodation in
19   violation of subsection 12940(m) of FEHA; (4) retaliation in
20   violation of California Labor Code section 1102.5; (5)
21   interference with entitlements protected by CFRA; (6)
22   interference with entitlements protected by the FMLA; (7)
23   retaliation in violation of CFRA; (8) discrimination in violation
24   of the FMLA; and (9) wrongful termination in violation of public
25   policy.  (Docket No. 2.)

26         Pursuant to Federal Rule of Civil Procedure 56, CRH now
27   moves for summary judgment on all of plaintiff's claims and her
28   requests for injunctive relief, back pay, and front pay.  (Docket

1  No. 25.)  Plaintiff also moves for summary judgment on her

2  failure to engage in the interactive process claim under

3  subsection 12940(n) of FEHA and CRH's affirmative defenses of

4  after-acquired evidence, unclean hands, good faith/bad faith, and

5  undue hardship.  (Docket No. 27.)

6  II.  Legal Standard

7        Summary judgment is proper "if the movant shows that

8  there is no genuine dispute as to any material fact and the

9  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

10  P. 56(a).  A material fact is one that could affect the outcome

11  of the suit, and a genuine issue is one that could permit a

12  reasonable jury to enter a verdict in the non-moving party's

13  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

14  (1986).  The party moving for summary judgment bears the initial

15  burden of establishing the absence of a genuine issue of material

16  fact and can satisfy this burden by presenting evidence that

17  negates an essential element of the non-moving party's case.

18  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

19  Alternatively, the moving party can demonstrate that the non-

20  moving party cannot produce evidence to support an essential

21  element upon which it will bear the burden of proof at trial.

22  Id.

23        Once the moving party meets its initial burden, the

24  burden shifts to the non-moving party to "designate 'specific

25  facts showing that there is a genuine issue for trial.'"  Id. at

26  324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,

27  the non-moving party must "do more than simply show that there is

28  some metaphysical doubt as to the material facts."  Matsushita

1  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

2  "The mere existence of a scintilla of evidence . . . will be

3  insufficient; there must be evidence on which the jury could

4  reasonably find for the [non-moving party]." *Anderson*, 477 U.S.

5  at 252.

6  In deciding a summary judgment motion, the court must

7  view the evidence in the light most favorable to the non-moving

8  party and draw all justifiable inferences in its favor. *Id.* at

9  255. "Credibility determinations, the weighing of the evidence,

10 and the drawing of legitimate inferences from the facts are jury

11 functions, not those of a judge . . . ruling on a motion for

12 summary judgment . . . ." *Id.* On cross-motions for summary

13 judgment, the court "must review the evidence submitted in

14 support of each cross-motion [in a light most favorable to the

15 non-moving party] and consider each party's motions on their own

16 merits." *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090,

17 1097 (W.D. Wash. 2004).

18 III.  Analysis

19    A.  FEHA Claims

20       1.  Subsection 12940(m): Reasonable Accommodation

21 Under subsection 12940(m) of FEHA, it is unlawful for

22 an employer "to fail to make reasonable accommodation for the

23 known physical or mental disability of an applicant or employee"

24 unless the accommodation would "produce undue hardship." Cal.

25 Gov't Code § 12940(m); *see also* Cal. Gov't Code § 12926(u)

26 (defining "undue hardship"). "The elements of a reasonable

27 accommodation cause of action are (1) the employee suffered a

28 disability, (2) the employee could perform the essential

4

functions of the job with reasonable accommodation, and (3) the employer failed to reasonably accommodate the employee's disability."  Nealy v. City of Santa Monica, 234 Cal. App. 4th 359, 373 (2d Dist. 2015).  The first element in this case is undisputed as the parties agree plaintiff suffered a disability for purposes of FEHA.

FEHA defines "essential functions" of a job as "the fundamental job duties of the employment position."  Cal. Gov't Code § 12926(f).  Essential functions do not include "marginal functions," which are those functions that, "if not performed, would not eliminate the need for the job or that could be readily performed by another employee or that could be performed in an alternative way."  Cal. Code Regs., tit. 2, § 11065(e)(3).

Under FEHA, the following non-exhaustive reasons may render a job function essential:

(A) . . . the reason the position exists is to perform that function.

(B) . . . the limited number of employees available among whom the performance of that job function can be distributed.

(C) The function may be highly specialized, so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

Cal. Gov't Code § 12926(f)(1).  FEHA provides that "[e]vidence of whether a particular function is essential includes, but is not limited to, the following:"

(A) The employer's judgment as to which functions are essential.

(B)   Written   job   descriptions   prepared   before

advertising or interviewing applicants for the job.

(C) The amount of time spent on the job performing the function.

(D) The consequences of not requiring the incumbent to perform the function.

(E) The terms of a collective bargaining agreement.

(F) The work experiences of past incumbents in the job.

(G) The current work experience of incumbents in similar jobs.

Id. § 12926(f)(2).

        a.   Essential Functions of Plaintiff's Position

At her deposition, plaintiff testified that the duties of the Health and Wellness Manager were described during her interview as follows:

That I would oversee the staff and the health and wellness department, that I would provide assessments for youth in the clinic and oversee the physician and the psychiatrist, that I would be over the kitchen and the kitchen staff, and that I would be over the medication assistants, provide incidental care to the youth, and then maintain compliance inside the medical clinic and in the kitchen.

(Canupp Dep. at 52:4-15.)

While working as CRH's Health and Wellness Manager, plaintiff estimated that she devoted about eighty percent of her daily time to providing direct medical care to the youth at CRH. (Id. at 63:9-17, 66:12-19.) She agreed that providing this care "basically" required her to be present at the clinic and that the

6

1   care included performing health assessments and responding to

2   health care emergencies.  (Id. at 63:18-25.)  Plaintiff further

3   testified that she spent approximately five percent of her daily

4   time performing indirect medical care, such as overseeing and

5   reviewing her staff's filling out of medical charts.  (Id. at

6   66:3-67:9.)  Plaintiff described some of her additional duties as

7   training and hiring employees in the clinic and kitchen and

8   training CRH staff on first aid, CPR, and OSHA.  (Id. at 69:21-

9   70:25.)  Plaintiff's descriptions of her duties are consistent

10  with those identified by CRH's executive director, David Ballard,

11  (Ballard Dep. at 62:8-63:13), and CRH's clinical manager, Anna

12  Naify, (Naify Dep. at 50:25-51:14).

13          Despite the undisputed evidence about plaintiff's

14  primary responsibilities, plaintiff argues that all of her

15  responsibilities were only "marginal" because "they could be

16  readily performed by another employee."  Cal. Code Regs., tit. 2,

17  § 11065(e)(3).  According to plaintiff, none of her duties were

18  essential because CRH was able to reshuffle her responsibilities

19  to account for her unanticipated absence, did not hire a new

20  nurse until June 2014, and the new nurse worked only part time.

21          A judge in this district recently rejected this precise

22  argument, concluding that an employee could not "show the in-

23  person aspects of his cashier position were not essential by

24  showing [the employer] was able to cope with his absence by

25  reassigning other employees to fulfill them."  Neufeld v. Winco

26  Holdings, Inc., No. 1:14-CV-1505 DAD JLT, 2016 WL 815649, at *4

27  (E.D. Cal. Mar. 2, 2016) (Mueller, J.).  In Neufeld, the court

28  entered summary judgment in favor of the employer and held that

1   "[r]egular, physical attendance was an essential function" of the

2   plaintiff's cashier position.  Id. at *3.  The court further

3   explained that "an employee may not create a dispute of material

4   fact by claiming the employer could have shifted others into the

5   plaintiff's position to perform the essential functions

6   temporarily."  Id. at *4.

7        The Ninth Circuit's decision in Lawler v. Montblanc N.

8   Am., LLC also cuts against plaintiff's position.  704 F.3d 1235

9   (9th Cir. 2013).  In Lawler, the employer had denied the manager

10  employee's request for reduced hours and a five-month leave of

11  absence.  Id. at 1243.  The Ninth Circuit affirmed the district

12  court's grant of summary judgment in favor of the employer under

13  sections 12940(a) and (h) of FEHA even though the employer had

14  filled the employee's position by making the assistant manager a

15  "de facto" manager and waited seven months to hire a new manager

16  after terminating the plaintiff.  See id. at 1241, 1244.  The

17  Ninth Circuit did not suggest that the employer's assignment of

18  the plaintiff's duties to another employee for seven months

19  rendered all of the plaintiff's duties non-essential or marginal.

20       That CRH had previously allowed plaintiff to work from

21  home for a short duration in September 2013 due to prior medical

22  issues and thereby temporarily excused her from her duties that

23  could not be performed remotely also does not create a disputed

24  fact as to plaintiff's essential functions.  Neufeld, 2016 WL

25  815649, at *4 ("[The employer's] willingness to make a temporary

26  exception does not create a disputed question of fact as to the

27  essential functions of [the employee's] job.").

28       The court therefore finds from the undisputed evidence

8

that one essential function of plaintiff's position was providing direct medical care to the youth at CRH.  If plaintiff could not perform this essential function with a reasonable accommodation, defendant is entitled to summary judgment on plaintiff's failure to accommodate claim under subsection 12940(m).  Cf. Nealy, 234 Cal. App. 4th at 374 ("The fact that one essential function may be up for debate does not preclude summary judgment if the employee cannot perform other essential functions even with accommodation.").

b.   Reasonable Accommodation

"A reasonable accommodation is a modification or adjustment to the work environment that enables the employee to perform the essential functions of the job he or she holds or desires."  Id. at 373.  "Reasonable accommodations may include, among other things, job restructuring or permitting an alteration of when and/or how an essential function is performed," but "elimination of an essential function is not a reasonable accommodation."  Id. at 374-75.  Plaintiff contends CRH should have provided her with the reasonable accommodations of (1) additional leave time; (2) the ability to work from home; or (3) assignment to a vacant position.

To the extent plaintiff argues that an accommodation is reasonable so long as it does not impose an undue hardship on the employer, she misstates the law.  "The question presented . . . is not whether [an accommodation] imposes an undue hardship, but whether the accommodation requested is reasonable and thus required in the first place."  Raine v. City of Burbank, 135 Cal. App. 4th 1215, 1227 (2d Dist. 2006).  "Consideration of the

9

1  potential hardship to an employer in assessing the reasonableness

2  of an accommodation does not alter the fact that, 'as part of

3  [his] prima facie case, [plaintiff] must establish [ ]he was

4  qualified to perform the essential duties of [his] job.'" Pratt

5  v. Delta Air Lines, Inc., No. 2:14-CV-00815-CAS, 2015 WL 2153397,

6  at *6 (C.D. Cal. May 4, 2015) (quoting Wills v. Superior Court,

7  195 Cal. App. 4th 143, 170 (4th Dist. 2011)) (alterations in

8  Pratt).

9                    i.   Additional Leave Time

10         "[A] finite leave can be a reasonable accommodation

11  under FEHA, provided it is likely that at the end of the leave,

12  the employee would be able to perform his or her duties." Hanson

13  v. Lucky Stores, Inc., 74 Cal. App. 4th 215, 226 (2d Dist. 1999).

14  A reasonable accommodation does not, however, "require the

15  employer to wait indefinitely for an employee's medical condition

16  to be corrected." Id. at 226-27 (internal quotation marks and

17  citation omitted).

18         At the time CRH terminated plaintiff, the undisputed

19  evidence was that plaintiff did not know when any of her

20  surgeries would be performed or when she might be able to return

21  to work. Moreover, in January 2014, not only was plaintiff

22  dealing with the back pain and problems she reported to CRH, she

23  also had the onset of foot drop, (Canupp Dep. at 320:21-23), and

24  has admitted that she "could not perform the essential functions

25  of her job as a nurse with a right foot drop." (Oceguera Decl.

26  Ex. 43 at 10:9-11 (Docket No. 26).) Because of the foot drop,

27  plaintiff's back surgeries were postponed indefinitely, and

28  plaintiff did not learn until June 2014 that she was no longer a

1  candidate for back surgery.  (Second Canupp Decl. ¶ 107 (Docket

2  No. 46).)  Although plaintiff did not inform CRH of the foot drop

3  or the postponing of her back surgeries, both only further

4  eliminated the possibility of plaintiff requesting a finite leave

5  of absence.  The undisputed evidence is that, at the time of her

6  termination, plaintiff did not know when any surgeries would be

7  performed or when she would be able to return to work.

8       Plaintiff suggests she may have been able to resume

9  working in May 2014 if she had received an epidural as initially

10 planned.  (Id. ¶ 94.)  It is undisputed, however, that plaintiff

11 remained on disability in May 2014.  (See Oceguera Decl. Ex. 30

12 (statements of disability benefits from California Employment

13 Development Department from January 2014 through August 2014).)

14 In fact, plaintiff continued to claim an inability to work due to

15 her disabilities in her October 21, 2014 disability benefits

16 claim submitted to the California Employment Development

17 Department and was certified by her medical practitioner as

18 disabled as part of that claim.  (Oceguera Decl. Ex. 31.)

19 Plaintiff did not resume working for a new company until November

20 2014[1] after she received an epidural on November 3, 2014.

21 (Second Canupp Decl. ¶ 95.)  Even assuming that her position with

22 the new company required the same physical duties as at CRH,[2]

23 _____

24       [1]     The evidence is not entirely clear as to when plaintiff
   resumed working.  The court adopts the earliest date plaintiff
25 suggests she resumed working or could have begun working for
   purposes of this motion.  (See Pl.'s Opp'n at 387:1-9.)

26       [2]     The parties dispute whether plaintiff's subsequent
27 positions, which were more administrative in nature, required the
   same physical demands as her position at CRH.  (See, e.g., Canupp
28 Dep. at 253:6-20, 378:7-19 (testifying that she began working for

11

1   this would have required CRH to provide plaintiff with a minimum

2   of nine additional months of leave.  Not only would this have

3   been a substantial duration of time, plaintiff's ability to even

4   return to work at that time was still unknown when CRH made the

5   decision to terminate her.

6        Under FEHA, this sort of indefinite leave is not a

7   reasonable accommodation.  Hanson, 74 Cal. App. 4th at 226-27.

8   The Ninth Circuit has also held that an employee who is "totally

9   disabled" cannot work at all and thus cannot present a genuine

10  issue of material fact that the employee could have performed the

11  essential duties with a reasonable accommodation.  See Lawler,

12  704 F.3d at 1243 (affirming the district court's grant of summary

13  judgment in favor of the employer when the employer had denied

14  the plaintiff's requests for reduced hours and a five-month leave

15  of absence (citing Kennedy v. Applause, Inc., 90 F.3d 1477, 1482

16  (9th Cir. 1996))).

17       Because the undisputed evidence shows that the duration

18  of any leave of absence at the time of plaintiff's termination

19  would have been indefinite, plaintiff cannot show that any

20  additional leave would have been a reasonable accommodation under

21  FEHA.  Accord Neufeld, 2016 WL 815649, at *4 ("[A] leave of

22  absence of undefined length is not a reasonable accommodation.");

23

24  Elica Health Care in January 2015 as the Director of Quality
    Assurance and Compliance and that the position did not involve
25  patient care or physical requirements akin to her duties at
    CRH).)  The court assumes for purposes of this motion that
26  plaintiff's subsequent positions required similar physical duties
    as her position at CRH or, even if they did not, that plaintiff
27  would have been able to fulfill similar physical duties during
    the times she was employed after her termination.
28
                                12

1  <u>Lara v. DNC Parks & Resorts at Tenaya, Inc.</u>, No. 1:14-CV-000103

2  LJO SAB, 2015 WL 4394618, at *14 (E.D. Cal. July 16, 2015) ("[I]f

3  the employer does not know when the employee will be able to

4  return to duty, the employer is not required to grant an

5  indefinite and lengthy leave.") (internal quotation marks and

6  citation omitted).

7                      ii.  <u>Working From Home</u>

8              Plaintiff contends that, if she had been granted

9  the accommodation of working from home on a part-time basis, she

10 could have fulfilled her duties of (1) overseeing the medical

11 clinic; (2) managing recordkeeping; (3) receiving phone calls to

12 determine whether or not a youth's health would allow admission

13 into CRH facilities; (4) maintaining stock of vaccines; and (5)

14 continuing policies and procedures processes.  (Second Canupp

15 Decl. ¶ 91; <u>accord</u> Canupp Dep. at 317:12-318:1.)  Even assuming

16 plaintiff could have adequately performed these duties remotely,

17 she does not contend that she could have performed all of her

18 essential duties from home.  Plaintiff represents that she could

19 have provided some patient care remotely by taking phone calls

20 and charting, (Canupp Dep. 318:19-320:2), but she neither argues

21 nor could a rational trier of fact find that she could have

22 provided all aspects of direct patient care, such as examining

23 patients, from her home.  <u>See</u> <u>Humphrey v. Mem'l Hosps. Ass'n</u>, 239

24 F.3d 1128, 1136 (9th Cir. 2001) ("Working at home is a reasonable

25 accommodation when the essential functions of the position can be

26 performed at home and a work-at-home arrangement would not cause

27 undue hardship for the employer."); <u>compare</u> <u>Samper v. Providence</u>

28 <u>St. Vincent Med. Ctr.</u>, 675 F.3d 1233 (9th Cir. 2012) (holding

that "on-site regular attendance" is an essential function for a neo-natal nurse for numerous reasons, including the requirements of "face-to-face interactions with patients and their families[] and working with medical equipment"), with Humphrey, 239 F.3d at 1137 (concluding that physical attendance is not an essential job function for a medical transcriptionist, especially when other medical transcriptionists for the employer already worked from home).

It is therefore undisputed plaintiff could not have remotely fulfilled all aspects of her essential duty of providing direct medical care to the youth at CRH.  Working from home was therefore not a reasonable accommodation under FEHA because "FEHA does not obligate the employer to accommodate the employee by excusing him or her from the performance of essential functions." Nealy, 234 Cal. App. 4th at 376; see also Samper, 675 F.3d at 1239 ("Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform any of his job functions, essential or otherwise.") (internal quotation marks and citation omitted) (emphasis added).

iii. Vacant Position

"Reasonable accommodation may also include 'reassignment to a vacant position' if the employee cannot perform the essential functions of his or her position even with accommodation."  Nealy, 234 Cal. App. 4th at 377 (quoting Cal. Gov't Code § 12926(p)(2)).  "FEHA requires the employer to offer the employee 'comparable' or 'lower graded' vacant positions for which he or she is qualified," but "does not require the employer

14

1  to promote the employee or create a new position for the employee
2  to a greater extent than it would create a new position for any
3  employee, regardless of disability."  Id. (quoting Cal. Code
4  Regs., tit. 2, § 11068(d)(1), (2)).

5          "In cases when courts have found a triable issue on
6  reassignment, the employees have adduced evidence obtained
7  through discovery that vacant positions for which they were
8  qualified existed during the relevant period, but the employer
9  failed to offer the positions to them."  Id.  Here, there is no
10  evidence from which to even infer that CRH had a vacant position
11  for which plaintiff was qualified.  Moreover, plaintiff has
12  established that the only possible responsibilities she could
13  have performed would have had to be performed exclusively from
14  home and there is no evidence that CRH had any positions that
15  allowed an employee to work entirely from home.  A genuine issue
16  of material fact thus does not exist as to whether CRH could have
17  reasonably accommodated plaintiff by offering her a vacant
18  position.

19          Accordingly, because it is undisputed that plaintiff
20  could not perform all of the essential functions of her position
21  with a reasonable accommodation, the court must grant defendant's
22  motion for summary judgment on her subsection 12940(m) claim.

23          2.    Subsection 12940(a): Disability Discrimination
24          Subsection 12940(a) of FEHA renders it unlawful for an
25  employer to discharge an employee because of the employee's
26  "medical condition" unless the employee, "because of his or her
27  physical or mental disability, is unable to perform his or her
28  essential duties even with reasonable accommodations."  Cal.

15

1    Gov't Code § 12940(a)(1).  "A prima facie case of disability

2    discrimination under FEHA requires the employee to show he or she

3    (1) suffered from a disability, (2) was otherwise qualified to do

4    his or her job, and (3) was subjected to adverse employment

5    action because of the disability."  Nealy, 234 Cal. App. 4th at

6    378.  "[A] qualified individual is someone who is able to perform

7    the essential functions of his or her job, with or without

8    reasonable accommodation," which is "identical" to the showing

9    "required for a cause of action for failure to reasonably

10    accommodate."  Id.; accord Green v. State, 42 Cal. 4th 254, 262

11    (2007) ("[I]n order to establish that a defendant employer has

12    discriminated on the basis of disability in violation of the

13    FEHA, the plaintiff employee bears the burden of proving he or

14    she was able to do the job, with or without reasonable

15    accommodation.").

16         CRH does not dispute that it terminated plaintiff

17    because of her disability once her leave expired and her

18    disability prevented her from returning to work.  Nonetheless,

19    plaintiff cannot establish a triable issue of fact with respect

20    to whether she was qualified to do her job because, as previously

21    discussed, it is undisputed that she could not perform the

22    essential duties of her job with a reasonable accommodation.

23    Accordingly, the court must grant defendant's motion for summary

24    judgment on plaintiff's subsection 12940(a) disability

25    discrimination claim.[3]

26

27        [3]    Subsection 12940(a) also makes it unlawful for an employer to discharge an employee because of the employee's

28    "military and veteran status."  Cal. Gov't Code § 12940(a).  In her opposition to CRH's motion for summary judgment, plaintiff

1                    3.    Subsection 12940(n): Interactive Process

2                    Under subsection 12940(n), it is unlawful for an

3     employer "to fail to engage in a timely, good faith, interactive

4     process with the employee or applicant to determine effective

5     reasonable accommodations, if any, in response to a request for

6     reasonable accommodation by an employee or applicant with a known

7     physical or mental disability or known medical condition."  Cal.

8     Gov't Code § 12940(n).  "The employee must initiate the process

9     unless the disability and resulting limitations are obvious," and

10    the employee must "'specifically identify the disability and

11    resulting limitations, and [] suggest the reasonable

12    accommodations.'"  Scotch v. Art Inst. of Cal.-Orange Cnty.,

13    Inc., 173 Cal. App. 4th 986, 1013 (4th Dist. 2009) (quoting

14    Taylor v. Principal Fin. Grp., Inc., 93 F.3d 155, 165 (5th Cir.

15    1996).  "FEHA requires an informal process with the employee to

16    attempt to identify reasonable accommodations, not necessarily

17    ritualized discussions."  Nealy, 234 Cal. App. 4th at 379.

18                    "Both employer and employee have the obligation 'to

19    keep communications open' and neither has 'a right to obstruct

20    the process.'"  Scotch, 173 Cal. App. 4th at 1014 (quoting Jensen

21    v. Wells Fargo Bank, 85 Cal. App. 4th 245, 266 (2d Dist. 2000)).

22    "Each party must participate in good faith, undertake reasonable

23    efforts to communicate its concerns, and make available to the

24    _____

25    mentions that CRH's Chief Financial Officer had stated he would
      not have hired plaintiff if he knew she was disabled and a
26    veteran.  (Pl.'s Opp'n at 29:19-22 (Docket No. 44).)  Assuming
      plaintiff raises this circumstantial evidence to suggest CRH
27    terminated her because of her status as a veteran, her claim and
      the allegations in her Complaint are limited to disability
28    discrimination.  (See Compl. ¶¶ 32-39.)

                                        17

1    other information which is available, or more accessible, to one

2    party." Gelfo v. Lockheed Martin Corp., 140 Cal. App. 4th 34, 62

3    n.22 (2006). "Liability hinges on the objective circumstances

4    surrounding the parties' breakdown in communication, and

5    responsibility for the breakdown lies with the party who fails to

6    participate in good faith." Id.

7         While an employee "cannot necessarily be expected to

8    identify and request all possible accommodations during the

9    interactive process itself" because the employee does not have

10   all the information about possible positions and accommodations,

11   "once the parties have engaged in the litigation process, . . .

12   the employee must be able to identify an available accommodation

13   the interactive process should have produced." Scotch, 173 Cal.

14   App. 4th at 1018. "[T]he employee who brings a section 12940(n)

15   claim bears the burden of proving a reasonable accommodation was

16   available before the employer can be held liable under the

17   statute." Nadaf-Rahrov v. Neiman Marcus Grp., Inc., 166 Cal.

18   App. 4th 952, 984 (1st Dist. 2008); accord Nealy, 234 Cal. App.

19   4th at 379; Scotch, 173 Cal. App. 4th at 1018-19; Neufeld, 2016

20   WL 815649, at *5; Weeks v. Union Pac. R.R. Co., --- F. Supp. 3d -

21   ---, ----, No. 1:13-CV-1641 AWI JLT, 2015 WL 5915271, at *17

22   (E.D. Cal. Oct. 7, 2015); Alejandro v. ST Micro Elecs., Inc, No.

23   15-CV-01385 LHK, 2015 WL 5262102, at *7 (N.D. Cal. Sept. 9,

24   2015).[4]

25   _____

26       [4]  "The California courts are split on whether an employer
     can still be held liable for failure to engage in the interactive
27   process even if it turns out that no reasonable accommodation was
     available." DelGiacco v. Cox Commc'ns, Inc., No. SACV 14-0200
28   DOC, 2015 WL 1535260, at *15 (C.D. Cal. Apr. 6, 2015). In

1          a.    Breakdown in Communications

2          On December 9, 2013, plaintiff informed CRH's human

3    resources manager, Norma Mesa,[5] and, CRH's clinical manager,

4    Naify, via email that she would be sending her FMLA paperwork and

5    would be "filling [sic] for disability after [] miss[ing] the 8th

6    day of work."  (Oceguera Decl. Ex. 12.)  Plaintiff stated that

7    she did "not have a return date as of right now due to the

8    pending appointment with the specialist."  (Id.)

9    _____

10   Scotch, the Fourth District "synthesize[d]" the apparent split to
     distinguish between the employee's lesser burden during the
     interactive process and heightened burden to prevail on a FEHA
11   claim.  See Scotch, 173 Cal. App. 4th at 1018 ("We synthesize
     Wysinger, Nadaf-Rahrov, and Claudio with our analysis of the law
12   as follows: To prevail on a claim under section 12940,
     subdivision (n) for failure to engage in the interactive process,
13   an employee must identify a reasonable accommodation that would
     have been available at the time the interactive process should
14   have occurred.  An employee cannot necessarily be expected to
     identify and request all possible accommodations during the
15   interactive process itself because [e]mployees do not have at
     their disposal the extensive information concerning possible
16   alternative positions or possible accommodations which employers
     have.  However, as the Nadaf-Rahrov court explained, once the
17   parties have engaged in the litigation process, to prevail, the
     employee must be able to identify an available accommodation the
18   interactive process should have produced . . . .")  (internal
     quotation marks and citations omitted) (alteration in original).
19          The Central District recently found Scotch's "reasoning
     persuasive because it incentivizes employers to provide
20   information about potential reasonable accommodations during the
     interactive process (since that information will come out in
21   discovery anyway) and it gives employees leverage to hold
     employers accountable to their obligation to engage in the
22   interactive process without burdening employees with the
     responsibility to articulate reasonable accommodations before
23   they gain access to information in the employer's possession."
     DelGiacco, 2015 WL 1535260, at *16.  This court agrees with
24   DelGiacco.

25

26        [5]    Norma Mesa's last name was Thomson at the time she
     worked at CRH and some of the evidence refers to her by that last
27   name.  (Mesa Decl. ¶ 2.)

28
                              19

1        Less than four hours later that same day, plaintiff

2  sent Mesa and Naify a second email to verify that they had

3  received her FMLA paperwork.  In that email, plaintiff proposed

4  working from home:

> I could still possibly do work from home in bed if you
> would like.  I can still work on paperwork and p&p's
> during my down time.  I could even still accept phone
> calls.  I can do a lot of my work from a distance.
> The only thing that will be affected is head to toe
> assessment which I can have doctor Carson do.  My MA's
> are still able to issue TB test under my license I
> will just need to sign off on those once weekly.  I
> can work on IR's and other training or program
> statements.

(Id. Ex. 13.)

        That same day, CRH approved plaintiff's FMLA leave and

indicated that her leave would expire on January 11, 2014 because

CRH utilizes a "rolling" calendar that measures leave from the

date of the employee's first FMLA leave usage.  (Id. Exs. 15,

16.)  Mesa notified plaintiff via mail and also mailed plaintiff

FMLA forms and notices.  (Mesa Decl. ¶ 12.)  Plaintiff denies

that she received the FMLA leave approval and paperwork.  (Second

Canupp Decl. ¶ 82.)

        On December 10, plaintiff sent Mesa and Naify an email

to "figure out how [she] should proceed for now with work."

(Oceguera Decl. Ex. 17.)  Plaintiff explained that she had been

receiving "phone calls and emails all day long" and wanted to

know whether she was "allowed to work from home" or should "let

them know [she] is out."  (Id.)  Mesa contends she told plaintiff

that CRH could not accommodate her request to work from home, but

that her FMLA leave was approved.  (Mesa Decl. ¶ 14.)  Plaintiff,

1  on the other hand, indicates that Mesa never returned her phone

2  call and she never spoke with anyone from CRH about her request

3  to work from home.  (Second Canupp Decl. ¶¶ 77-79.)

4         On December 19, plaintiff sent Mesa and Naify an email

5  informing them that she had met her "spinal doctor" and he said

6  she would need surgery and "must stay laying down until surgery."

7  (Oceguera Decl. Ex. 20.)  A surgery date had not yet been

8  scheduled because plaintiff's insurance company needed to approve

9  the surgery.  (Id. Ex. 20.)

10        On January 2, 2014, plaintiff emailed Mesa, Naify, and

11 Ballard inquiring about the status of her FMLA leave request and

12 the specific date her FMLA coverage would end.  She explained,

13 "The reason I am asking for this is because my temporary medical

14 disability may exceed the time allotted for FMLA.  I am trying to

15 start the interactive process to discuss reasonable

16 accommodations that I will need during the time that I am

17 temporarily disabled and can return to work after surgery."  (Id.

18 Ex. 21.)  In that email, plaintiff indicated that she was

19 currently "waiting for the insurance approval for two separate

20 procedures" and would "have a better timeframe" once the approval

21 was received.  (Id. Ex. 21.)

22        At her deposition, plaintiff testified that she sent

23 the January 2 email because she had left multiple voicemails

24 since December 19 requesting returned calls to discuss her FMLA

25 leave, but never received a return call.  (Canupp Dep. at 134:1-

26 19, 136:2-18.)  Mesa, Naify, and Ballard deny that they ever

27 received a voicemail from plaintiff asking for a return call to

28

1   discuss her situation.   (Mesa Decl. ¶ 16; Naify Decl. ¶ 16;

2   Ballard Decl. ¶ 14.)

3         The following day, on January 3, Mesa sent plaintiff a

4   letter reaffirming that her FMLA leave had been approved and was

5   set to expire on January 11, 2014.   (Oceguera Decl. Ex. 22.)

6   Mesa also informed plaintiff that CRH was "automatically

7   extend[ing] a 30-day personal leave for [plaintiff] starting

8   immediately after [her] FMLA exhausted," and this personal leave

9   would expire February 11, 2014.   (Id. Ex. 22.)   The letter also

10  stated that plaintiff's "doctor note indicates no possible return

11  date," and Mesa requested plaintiff immediately, but no later

12  than February 11, forward "any other information from [her]

13  doctor indicating [her] surgery/recovery date and/or return

14  date."   (Id. Ex. 22.)   Plaintiff denies that she received this

15  letter.   (Canupp Dep. at 136:22-137:9.)

16        About a week after she sent the email on January 2,

17  plaintiff went to CRH to talk with Mesa about her email.   Because

18  Mesa was out of the office, plaintiff went to Naify's office and

19  Naify told plaintiff that Mesa would get back to her.   (Id. at

20  310:10-25.)   Other than this visit, there is no evidence that

21  plaintiff and CRH exchanged any communications about plaintiff's

22  leave or request to work from home between January 3 and her

23  termination.   Plaintiff does not recall whether she sent another

24  email to anyone at CRH, (id. at 314:5-315:1, 324:17-21), and

25  contends that she never received a phone call, email, or letter

26  from CRH during this time, (Second Canupp Decl. ¶ 84).   On

27  January 13, Naify had sent an email to all employees, including

28  plaintiff, indicating that CRH did not have a "solid return date"

1   for plaintiff and that employees should contact Naify or another

2   manager in her absence.  (Oceguera Decl. Ex. 23.)  CRH also

3   exchanged at least one additional email with plaintiff on another

4   matter.  (See Canupp Dep. at 302:10.)

5          On February 13, 2014, CRH terminated plaintiff's

6   employment indicating that her FMLA and personal leave had

7   expired and plaintiff had "not provided [CRH] with any possible

8   return date to work" and "[a]ll indications that [plaintiff had]

9   provided are that [her] absence will be of a protracted and

10  unknown duration."  (Oceguera Decl. Ex. 25.)

11         Although it is undisputed that plaintiff initiated the

12  interactive process, there are numerous factual disputes that

13  preclude the court from determining which party is responsible

14  for the breakdown in communications as a matter of law.  While

15  CRH has put forth evidence of its attempts to communicate with

16  plaintiff and requests for information about her condition,

17  plaintiff denies receiving all of these correspondences.  It is

18  the jury's role to assess the credibility of the witnesses and

19  determine whether CRH in fact sent and plaintiff received the

20  communications CRH claims it sent to plaintiff to obtain

21  information plaintiff was obligated to provide.  Anderson, 477

22  U.S. at 255.

23              b.   Availability of Reasonable Accommodation

24         Nonetheless, even if the court assumes that all fault

25  for the breakdown in the interactive process lies with CRH,

26  plaintiff could survive summary judgment only by showing that "a

27  reasonable accommodation was available."  See Nadaf-Rahrov, 166

28  Cal. App. 4th at 984.  As discussed in the context of plaintiff's

                                23

1    subsection 12940(m) claim, plaintiff cannot show or even

2    establish a triable issue of fact with respect to whether a

3    reasonable accommodation was possible.  As the court previously

4    concluded, neither an indefinite leave of absence nor working

5    remotely were reasonable accommodations under the circumstances

6    and there is no evidence that a vacant remote position was

7    available.

8        Accordingly, because no rational jury could find that a

9    reasonable accommodation existed, plaintiff cannot create a

10   triable issue of fact on her subsection 12940(n) interactive

11   process claim and the court must grant CRH's motion for summary

12   judgment and deny plaintiff's cross-motion for summary judgment

13   on that claim.

14       B.   FMLA Claims

15       "The FMLA creates two interrelated, substantive

16   employee rights: first, the employee has a right to use a certain

17   amount of leave for protected reasons, and second, the employee

18   has a right to return to his or her job or an equivalent job

19   after using protected leave."  Bachelder v. Am. W. Airlines,

20   Inc., 259 F.3d 1112, 1122 (9th Cir. 2001).  Subsection 2615(a) of

21   the FMLA "sets forth two very different ways to protect these

22   substantive rights."  Sanders v. City of Newport, 657 F.3d 772,

23   777 (9th Cir. 2011).  First, an employee can bring a

24   "discrimination" or "retaliation" claim if the employer

25   "'discharge[s] or in any other manner discriminate[s] against any

26   individual for opposing any practice made unlawful'" by the FMLA.

27   Id. (quoting 29 U.S.C. § 2615(a)(2)).  Second, an employee can

28   bring an "interference" or "entitlement" claim if the employer

24

"'interfere[s] with, restrain[s], or den[ies] the exercise of or the attempt to exercise' the substantive rights guaranteed by FMLA." Id. (quoting 29 U.S.C. § 2615(a)(1)).

### 1.   FMLA Retaliation Claim

Although plaintiff's eighth cause of action alleges discrimination in violation of the FMLA, she neither alleges nor submits evidence supporting an inference that she "'oppos[ed] any practice made unlawful'" by the FMLA.  Id. (quoting 29 U.S.C. § 2615(a)(2)).  Nor does she articulate a theory of an FMLA retaliation claim that is independent of CRH's alleged miscalculation of her FMLA leave entitlement.  (See Pl.'s Opp'n at 49:19-50:2); see also Johnson v. Morehouse Coll., Inc., 199 F. Supp. 2d 1345, 1361 (N.D. Ga. 2002) ("[A]n employer is not subject to the 'retaliation' prohibitions of the statute by virtue of his miscalculation, alone.").  Accordingly, because there is no genuine issue of material fact giving rise to a cognizable FMLA retaliation claim, the court will grant CRH's motion for summary judgment on that claim.

### 2.   FMLA Interference Claim

With respect to plaintiff's FMLA interference claim, "[t]he FMLA creates two interrelated substantive rights for employees":

> First, an employee has the right to take up to twelve weeks of leave for the reasons described above. Second, an employee who takes FMLA leave has the right to be restored to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return from leave.

1  <u>Xin Liu v. Amway Corp.</u>, 347 F.3d 1125, 1132 (9th Cir. 2003).  To

2  establish a prima facie case based on an FMLA interference claim,

3  "the employee must establish that: (1) he was eligible for the

4  FMLA's protections, (2) his employer was covered by the FMLA, (3)

5  he was entitled to leave under the FMLA, (4) he provided

6  sufficient notice of his intent to take leave, and (5) his

7  employer denied him FMLA benefits to which he was entitled."  <u>Id.</u>

8  at 778; <u>see also</u> <u>id.</u> (noting that other circuits apply the

9  <u>McDonnell Douglas</u> burden shifting to FMLA interference claims,

10  but the Ninth Circuit has rejected this approach).  Under an FMLA

11  interference claim, "the employer's intent is irrelevant to a

12  determination of liability."  <u>Id.</u>

13         Here, the parties do not dispute that CRH was subject

14  to the FMLA, that plaintiff was eligible for and entitled to take

15  FMLA leave, and that plaintiff provided sufficient notice of her

16  intent to take leave.  The only dispute is whether CRH

17  incorrectly calculated her FMLA leave and failed to reinstate her

18  in violation of the FMLA.

19            a.   <u>FMLA Entitlement to Twelve Weeks of Leave</u>

20         Under the FMLA, "an eligible employee's FMLA leave

21  entitlement is limited to a total of 12 workweeks of leave during

22  any 12-month period."  29 C.F.R. § 825.200(a).  Under

23  § 825.200(b), an employer may "choose any one of the following

24  methods for determining the 12-month period in which the

25  [employee's] 12 weeks of leave entitlement" is calculated:

26      (1) The calendar year;

27

28

26

(2) Any fixed 12-month leave year, such as a fiscal year, a year required by State law, or a year starting on an employee's anniversary date;

(3) The 12-month period measured forward from the date any employee's first FMLA leave under paragraph (a) begins; or,

(4) A "rolling" 12-month period measured backward from the date an employee uses any FMLA leave as described in paragraph (a).

Id. § 825.200(b)(1)-(4).  An employer may "choose any one of the alternatives . . . provided the alternative chosen is applied consistently and uniformly to all employees."  Id. § 825.200(d)(1).  "If an employer fails to select one of the options in paragraph (b) of this section for measuring the 12-month period for the leave entitlements described in paragraph (a), the option that provides the most beneficial outcome for the employee will be used."  Id. § 825.200(e).

The parties dispute the total FMLA leave plaintiff had utilized prior to her taking FMLA leave in December 2013 through January 2014.  For example, while the parties agree plaintiff took FMLA leave from December 2012 and January 2013, the evidence is inconsistent as to the dates plaintiff was actually on leave. (Compare Oceguera Decl. Ex. 4 (plaintiff's FMLA request indicating plaintiff took FMLA leave from December 28, 2012 to January 14, 2013 to undergo a surgery), with Second Canupp Decl. ¶ 60, Ex. Q (indicating plaintiff was on leave December 10, 2012 to January 4, 2013).)

The parties also dispute how much time plaintiff was on leave in August and September 2013.  During that time, plaintiff was originally scheduled to be on leave from August 9, 2013 to

September 2, 2013, but on September 5, plaintiff informed CRH via email that her incision had opened and she would not be able to return to work until September 23, 2013.  (Oceguera Decl. Ex. 7.) Plaintiff contends that September 2 was a holiday and that she had worked from home September 3-6, 2013 and again from home on September 16-20, 2013.  (Second Canupp Decl. ¶¶ 66, 69.)  Mesa on the other hand, testified that she does not recall plaintiff having worked from home during that time.  (Mesa Dep. at 79:7-12. But see Naify Dep. at 174:1-22 (testifying that she did not recall what days plaintiff worked from home in September 2013, but recognized that emails reflect plaintiff did work on September 3-5).)

Even assuming the parties did not dispute when plaintiff took off in August and September 2013, it is undisputed that CRH did not initially designate any of that time off as FMLA leave.  Mesa contends only that she "later" told plaintiff that her time off in August and September had been approved as FMLA leave and that the time off was "subsequently marked as FMLA time on attendance reports."  (Mesa Decl. ¶ 8.)  Mesa does not identify or estimate when she later determined that the time off in August and September 2013 would count as FMLA leave, when she told plaintiff it had been approved as FMLA leave, or when it was subsequently marked on plaintiff's timesheets.  In her letter dated January 3, 2014 informing plaintiff that her FMLA leave was approved, Mesa stated:

> Since [CRH] uses a "rolling calendar" and FMLA was taken last year summer, your FMLA will expire on January 11, 2014.  All absences in connection with your serious health condition were counted as leave

28

provided under the [FMLA] and [CFRA].  This will be the case whether the leave taken is part of a day, one full day, or two or more consecutive days.

(Oceguera Decl. Ex. 22.)

Although § 825.301(d) permits an employer to "retroactively designate leave as FMLA leave . . .  provided that the employer's failure to timely designate leave does not cause harm or injury to the employee," it requires the employer to provide the employee with notice of the retroactive designation. 29 C.F.R. § 825.301(d).  Plaintiff denies that she received the January 3, 2014 letter from Mesa and contends that she was never given notice that any of her time off in August and September would be counted as FMLA leave.  (Second Canupp Decl. ¶¶ 64, 68.) Plaintiff further represents that she and Mesa had agreed that the time from August 27-30, 2013 would be considered sick leave. (Id. ¶¶ 64-65, 68).  Genuine disputes of fact therefore exist as to the amount of time plaintiff was off in August and September 2013 and whether CRH provided plaintiff with sufficient notice to retroactively designate any of that time as FMLA leave.

Plaintiff also disputes CRH's right to calculate plaintiff's leave under the twelve-month rolling basis under § 825.200(b)(4).  According to plaintiff, Mesa verbally informed her in December 2013 that CRH would utilize the twelve-month period method and that plaintiff was eligible for a full twelve weeks of FMLA leave.  (Canupp Dep. at 108:23-111:3, 122:10-18.) Although defendant indicated in the FMLA paperwork from December 2013 that it was utilizing the "rolling" method, (see Oceguera Decl. Ex. 15, Ex. 16 at 2), plaintiff denies having received

29

1   these notices.  There is also no evidence tending to suggest that

2   CRH had "consistently and uniformly" applied the rolling twelve-

3   month period to all employees.

4           Accordingly, because genuine issues of material fact

5   preclude the court from determining the amount of FMLA leave

6   plaintiff had taken prior to December 2013 and the method CRH

7   utilized to calculate that leave, the court must deny CRH's

8   motion for summary judgment on plaintiff's FMLA interference

9   claim with respect to her claim that CRH did not provide her with

10  twelve weeks of FMLA leave.

11              b.    FMLA Right to Reinstatement

12          Plaintiff also seeks relief under the FMLA based on

13  defendant's failure to reinstate her at the expiration of her

14  FMLA leave.  "The right to reinstatement guaranteed by 29 U.S.C.

15  § 2614(a)(1) is the linchpin of the entitlement theory because

16  the FMLA does not provide leave for leave's sake, but instead

17  provides leave with an expectation that an employee will return

18  to work after the leave ends."  Sanders, 657 F.3d at 778

19  (internal quotation marks and citation omitted).[6]  "Although the

20          [6]   Sanders and cases cited therein could be read to
21  suggest that plaintiff's inability to return to work when her
    FMLA leave expired is also fatal to her FMLA claim based on CRH's
22  failure to provide her with the required twelve weeks of leave.
    See Sanders, 657 F.3d at 778 (citing Edgar v. JAC Products, Inc.,
23  443 F.3d 501, 506-07 (6th Cir. 2006)); see also Edgar, 443 F.3d
    at 506-07 ("This court has consequently held that an employer
24  does not violate the FMLA when it fires an employee who is
    indisputably unable to return to work at the conclusion of the
25  12-week period of statutory leave."); accord Cehrs v. Ne. Ohio
    Alzheimer's Research Ctr., 155 F.3d 775, 784-85 (6th Cir. 1998)
26  ("[I]t would be elevating form over substance to say that the
    effective termination date chosen by [employer] is meaningful to
27  the Court's analysis under the FMLA" when it is undisputed the
    employee was unable to return to work when FMLA leave expired).

28

1   FMLA created a statutory right to reinstatement after taking FMLA

2   leave, this right is not without limits."  Id.

3       Subsection 825.214(b) provides, "[i]f the employee is

4       The FMLA provides, however, that an employee may seek
5   "damages equal to--(i) the amount of--(I) any wages, salary,
    employment benefits, or other compensation denied or lost to such
6   employee by reason of the violation . . . ."  29 U.S.C. § 2617
    (emphasis added); see also 29 U.S.C. § 2614(a)(2) ("The taking of
7   leave under section 2612 of this title shall not result in the
    loss of any employment benefit accrued prior to the date on which
8   the leave commenced."); 29 U.S.C. § 2614(c)(1) ("Except as
    provided in paragraph (2), during any period that an eligible
9   employee takes leave under section 2612 of this title, the
    employer shall maintain coverage under any 'group health plan'
10  (as defined in section 5000(b)(1) of Title 26) for the duration
    of such leave at the level and under the conditions coverage
11  would have been provided if the employee had continued in
    employment continuously for the duration of such leave.");
12  Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1122 n.7 (9th
13  Cir. 2001) ("The FMLA also entitles employees to retain any
    employer-paid health benefits while using FMLA-protected leave,
14  subject to the proviso that if the employee fails to return to
    work at the end of his or her leave, the employer may recover
15  from the employee the premiums paid for maintaining coverage
    during the employee's absence.").
16
        The regulations governing FMLA claims directly address
17  an employee's right to continued medical coverage even when the
    employee "may be unable to return to work but expresses a
18  continuing desire to do so."  29 C.F.R. § 825.311(b); see 29
19  C.F.R. § 825.311(b) ("If an employee gives unequivocal notice of
    intent not to return to work, the employer's obligations under
20  FMLA to maintain health benefits (subject to COBRA requirements)
    and to restore the employee cease.  However, these obligations
21  continue if an employee indicates he or she may be unable to
22  return to work but expresses a continuing desire to do so.").)
    As previously discussed, the last correspondence CRH received
23  from plaintiff indicated her desire to return to work after her
    surgeries and, although CRH requested additional assurances as
24  the regulations contemplate, see id. § 825.311(a), plaintiff
    denies that she received any of these requests.
25
        Plaintiff has thus established disputed issues of
26  material fact that CRH did not provide her with twelve weeks of
    FMLA leave, she never expressed an "unequivocal notice of intent
27  not to return to work," id. § 825.311(b), she lost FMLA-protected
    health coverage upon her termination, and she incurred damages as
28  a result of prematurely losing her health coverage.

1  unable to perform an essential function of the position because

2  of a physical or mental condition, including the continuation of

3  a serious health condition, the employee has no right to

4  restoration to another position under the FMLA." 29 C.F.R.

5  § 825.214(b).  The Ninth Circuit has held that, "when an employer

6  seeks to establish that he has a legitimate reason to deny an

7  employee reinstatement, the burden of proof on that issue rests

8  with the employer." Sanders, 657 F.3d at 780.

9         According to plaintiff's theory of how her FMLA should

10 have been calculated, plaintiff's leave should have extended

11 through February 28, 2014.  In her declaration, plaintiff seems

12 to suggest that she could have returned to work at that time:

13
>       I was scheduled to receive pirifomris injections from
14>       Dr. Hendrickson's office in January 2015, as these
>       injections assist greatly in reducing my back pain and
15>       allow me to have higher functionality.  However, due
>       to a respiratory infection I was not able to have
16>       these pirifomris injections until after I had
>       completed all my antibiotics which was in
17>       approximately late February 2015, as such I was
>       required to manage my pain with oral medication.  The
18>       pain I was experiencing during this period of time,
>       however, was not unmanageable and it did not prevent
19>       me from going to work.  After I finished my round of
>       antibiotic I received the scheduled pirifomris
20>       injections and again obtained significant pain relief
21>       from this particular procedure.

22

23 (Second Canupp Decl. ¶ 97 (emphasis added).)

24        When faced with conflicting evidence about a

25 plaintiff's claim of an ability to work during litigation despite

26 the plaintiff having previously sought and received disability

27 benefits, the Ninth Circuit rejected the plaintiff's

28 "uncorroborated and self-serving" deposition testimony.  Kennedy,

1   90 F.3d at 1481.  The plaintiff in <u>Kennedy</u> testified in her

2   deposition that she was not totally disabled during the period in

3   question.  <u>Id.</u>  On the state disability and social security claim

4   forms submitted for that time, however, the plaintiff had

5   represented that she was "completely disabled for all work-

6   related purposes," and this representation was consistent with

7   her physician's assessment of her.  <u>Id.</u>  The Ninth Circuit found

8   that plaintiff's "deposition testimony flatly contradicts both

9   her prior sworn statements and the medical evidence," and as such

10  fails to create a "<u>genuine</u> dispute" as to whether the plaintiff

11  was disabled during the time in question.  <u>Id.</u>

12          Similar to <u>Kennedy</u>, it is undisputed that plaintiff was

13  receiving disability benefits in February 2014, (Oceguera Decl.

14  Ex. 30), and had been certified by her physician as disabled

15  during that time.  (See <u>id.</u> Ex. 31 at 4, 8-13.)[7]  The notice that

16          [7]    Plaintiff objects to the court's consideration of

17  Exhibit 31 on the grounds that the attorney who submitted it via
    declaration lacks personal knowledge and cannot properly

18  authenticate or lay the foundation for the documents and that the
    documents contain inadmissible hearsay.  Although CRH could have

19  done more to address these evidentiary concerns, plaintiff does
    not dispute that the claim forms are accurate copies of the claim

20  forms she submitted or that CRH could address these evidentiary
    concerns at trial.  <u>See generally</u> <u>Burch v. Regents of Univ. of</u>

21  <u>California</u>, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006) ("[W]hen
    evidence is not presented in an admissible form in the context of

22  a motion for summary judgment, but it may be presented in an
    admissible form at trial, a court may still consider that

23  evidence. . . . Summary judgment is not a game of 'Gotcha!' in
    which missteps by the non-movant's counsel, rather the merits of

24  the case, can dictate the outcome. . . . Rule 56[c] requires only
    that evidence 'would be admissible', not that it presently be

25  admissible.  Such an exception to the authentication requirement
    is particularly warranted in cases such as this where the

26  objecting party does not contest the authenticity of the evidence
    submitted but nevertheless makes an evidentiary objection based

27  on purely procedural grounds.").  The court thus overrules

28

1  accompanied the statements of plaintiff's disability payments

2  instructed plaintiff, "To prevent overpayment on your claim, you

3  must immediately notify the Department if you recover from your

4  disability or return to work." (Id. Ex. 30.)  Plaintiff never

5  indicated that she could return to work in February 2014 and

6  continued to receive disability benefits for at least eight more

7  months.  Plaintiff cannot now rely on her self-serving deposition

8  testimony that the reprieve in pain she experienced from a

9  pirifomris injection creates a genuine dispute of fact that she

10 would have been able to return to work in February 2014.

11        Accordingly, because CRH has shown that plaintiff would

12 not have been able to return to work at the expiration of her

13 FMLA leave as she contends it should have been calculated, the

14 court must grant CRH's motion for summary judgment on plaintiff's

15 FMLA interference claim based on CRH's failure to reinstate

16 plaintiff at the expiration of her FMLA leave.

17        C.   CFRA Claims

18        The parties agree that plaintiff's CFRA claims are

19 subject to the same standards as her FMLA claims and therefore

20 withstand summary judgment only to the extent her FMLA claims do.

21 (Def.'s Mem. at 29:24-9, 30:27-31:28; Pl.'s Reply at 48:13-50:2);

22 accord Xin Liu, 347 F.3d at 1132 n.4 ("CFRA adopts the language

23 of the FMLA and California state courts have held that the same

24 
_____

25 plaintiff's objection to Exhibit 31.
        Plaintiff also raises eleven other objections to
26 evidence defendant submitted in support of its motion for summary
   judgment.  (See Docket Nos. 49.)  Because the court does not rely
27 on any of the evidence objected to in plaintiff's remaining
   objections, the court overrules those objections as moot.
28

                              34

1    standards apply.").  Accordingly, for the reasons previously

2    stated, the court will grant CRH's motion for summary judgment on

3    plaintiff's CFRA claims based on CRH's alleged retaliation and

4    termination of plaintiff before her CFRA leave expired, but deny

5    defendant's motion for summary judgment on plaintiff's CFRA claim

6    based on defendant's alleged failure to provide plaintiff with

7    the leave CFRA entitled her to take.

8         D.   Labor Code Section 1102.5: Whistleblower Claim

9         "Labor Code section 1102.5 is a whistleblower statute,

10   the purpose of which is to encourag[e] workplace whistle-blowers

11   to report unlawful acts without fearing retaliation."  Soukup v.

12   Law Offices of Herbert Hafif, 39 Cal. 4th 260, 287 (2006)

13   (internal quotation marks and citation omitted) (alteration in

14   original).  "Courts analyzing claims under Section 1102.5 apply

15   the burden shifting analysis first set forth by the United States

16   Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792

17   (1973)."  Ferretti v. Pfizer Inc., No. 11-CV-04486, 2013 WL

18   140088, at *10 (N.D. Cal. Jan. 10, 2013).

19        Under this framework, the plaintiff must first

20   establish a prima facie case, which requires a showing that "she

21   engaged in protected activity, that she was thereafter subjected

22   to adverse employment action by her employer, and there was a

23   causal link between the two."  Soukup, 39 Cal. 4th at 287-88

24   (internal quotation marks and citation omitted).[8]  If the

25        [8]   The court recognizes that, because defendant moved for
26   summary judgment, it carries the initial burden at summary
     judgment on this state law claim.  See Dep't of Fair Emp't &
27   Hous. v. Lucent Techs., Inc., 642 F.3d 728, 745 (9th Cir. 2011)
     ("Generally, the plaintiff [has] an initial burden of
28   establishing a prima facie case of discrimination.  When an

1 plaintiff successfully establishes her prima facie case, the

2 "burden of production, but not persuasion, [ ] shifts to the

3 employer to articulate some legitimate, nondiscriminatory reason

4 for the challenged action." Chuang v. Univ. of Cal. Davis, 225

5 F.3d 1115, 1123–24 (9th Cir. 2000) (citing McDonnell Douglas, 411

6 U.S. at 802). Assuming the employer carries its burden, the

7 plaintiff "must [then] show that the articulated reason[s] [are]

8 pretextual." Chuang, 225 F.3d at 1124.

9        1.   Protected Activity

10        Here, plaintiff repeatedly reported to management at

11 CRH alleged misconduct by an employee at CRH who was "helping

12 youth [from CRH] crawl out of a window" to leave CRH and engage

13 in prostitution. (Second Canupp Decl. ¶ 6; see generally Pl.'s

14 Opp'n at 4:8-8:2.) In February 2013, she also reported to CRH

15 management alleged misconduct by a different employee at CRH who

16 bringing a CRH youth to her home to engage in illicit conduct.

17 (Id. ¶ 14.) While plaintiff contends she was retaliated against

18 for these internal complaints, internal complaints are not

19 protected activity under section 1102.5. See Robles v.

20 Agreserves, Inc., No. 1:14-CV-540 AWI JLT, 2016 WL 323775, at

21

---

22 employer moves for summary judgment, however, the burden is
reversed . . . because the defendant who seeks summary judgment

23 bears the initial burden. Thus, [t]o prevail on summary
judgment, [the employer is] required to show either that (1)

24 plaintiff could not establish one of the elements of [the] [state
law] claim or (2) there was a legitimate, nondiscriminatory

25 reason for its decision to terminate plaintiff's employment.")
(internal quotation marks and citations omitted) (alterations and

26 omissions in original). Because the court would reach the same
conclusion under the analysis laid out in Lucent Technologies,

27 Inc., the court will assess the claim under the traditional
burden-shifting framework.

28

1  *34-35 (E.D. Cal. Jan. 27, 2016) (explaining that, prior to the

2  Legislature amending section 1102.5 in 2014, "only complaints or

3  reports made to a governmental agency [were] protected," and

4  "complaints or reports made 'internally' to the employer [were]

5  not protected").

6         After becoming increasingly "concerned with the way []

7  CRH was handling the internal investigations," however, plaintiff

8  contacted the DSS in April or May 2013.  (Second Canupp Decl. ¶

9  27.)  On June 14, 2013, DSS interviewed plaintiff at her home and

10  plaintiff disclosed to DSS what she knew about the alleged

11  misconduct and sexual abuse of youth at CRH and provided DSS with

12  notes and emails from her investigations of the misconduct.  (Id.

13  Ex. B (CCL's interview report).)  The Investigative Field Report

14  from that interview indicates that plaintiff also reported that

15  the Incident Reports submitted by CRH staff are "filtered through

16  the Human Resources (HR) department," which determines which

17  incidents to report to DSS and that sometimes Incident Reports

18  are not prepared after an internal investigation.  (Id. Ex. B.)

19         Three days later, on June 17, 2013, DSS interviewed

20  plaintiff a second time at CRH.  (Id. Ex. B.)  In that interview,

21  plaintiff told DSS that she does not agree with the ethical

22  boundaries" of CRH's associate director of residential services,

23  Karen Gregg, that there had been some "'juggling' of incident

24  reports," that Gregg had notified one of the CRH employees that

25  he was being investigated, and that there was another allegation

26  of alleged sexual misconduct between an employee of CRH and a CRH

27  youth.  (Id. Ex. B.)

28

1          Plaintiff has therefore established a prima facie case

2   that she engaged in protected activity for purposes of section

3   1102.5.

4          2.   Adverse Employment Action

5          "An adverse employment decision is one that 'materially

6   affect[s] the terms and conditions of employment.'"  Ferretti,

7   2013 WL 140088, at *10 (quoting Patten v. Grant Joint Union High

8   Sch. Dist., 134 Cal. App. 4th 1378, 1387 (3d Dist. 2005)).  "This

9   includes not only terminations, but also the 'entire spectrum of

10  employment actions that are reasonably likely to adversely and

11  materially affect an employee's job performance or opportunity

12  for advancement in his or her career.'"  Id. (quoting Patten, 134

13  Cal. App. 4th at 1387).  "[W]here a plaintiff alleges that her

14  employer engaged in a series of retaliatory acts, these acts may

15  be considered collectively in determining whether they materially

16  affected the plaintiff's performance."  See id.

17         "While '[m]inor or relatively trivial adverse actions

18  by employers or fellow employees that, from an objective

19  perspective, are reasonably likely to do no more than anger or

20  upset an employee do not' constitute adverse employment actions,

21  the definition of adverse employment actions 'must be interpreted

22  liberally and with a reasonable appreciation of the realities of

23  the workplace.'"  Id. (quoting Yanowitz v. L'Oreal USA, Inc., 36

24  Cal. 4th 1028, 1054 (2005)) (alteration in original).  The

25  California Supreme Court has, however, "rejected the definition

26  of adverse employment action that has been adopted by the Ninth

27  Circuit--which is any action that would deter an employee from

28  engaging in a protected activity."  Beagle v. Rite Aid Corp., No.

08-CV-1517 PJH, 2009 WL 3112098, at *6 (N.D. Cal. Sept. 23, 2009) (citing <u>Yanowitz</u> 36 Cal. 4th 1028).)

Plaintiff contends she suffered four adverse employment actions: (1) her termination in February 2013; (2) a reduction in her annual merit increase; (3) "Needs Improvement" ratings on her November 2013 employee review; and (4) written and verbal warnings.[9]  CRH concedes that plaintiff's termination constitutes an adverse employment action, but disputes whether the other three actions rise to the level of adverse employment actions for purposes of section 1102.5.

As to plaintiff's annual merit increase, Naify had originally proposed that plaintiff receive a 4% annual merit increase and then reduced the raise to 3%.  The decision to reduce plaintiff's merit increase is memorialized in an email from Mesa to Gregg dated October 31, 2013, which indicates only, "Okay, Anna responded and she is changing to 3%."  (Asbil Decl. Ex. 18.)  The only evidence before the court also shows that other employees all received 4% or 5% annual merit increases. (<u>See</u> <u>id.</u> Ex. 22 (reflecting raises of 4% or 5% for six other employees).)  Although plaintiff ultimately received an annual merit increase, the reduction of her merit increase from what she

_____

[9]  Although plaintiff has also put forth substantial evidence seeking to establish that she was mistreated by CRH employees because of her reporting, she seems to recognize that this conduct is not sufficient to rise to the level of an adverse employment action under section 1102.5.  <u>See</u> <u>Beagle</u>, 2009 WL 3112098, at *7 ("The alleged ostracism and blame by plaintiff's co-workers cannot be considered an adverse employment action under the applicable definition of that term, because those actions did not materially affect the terms, conditions, or privileges of plaintiff's employment.").

1   would have otherwise received is sufficient to "'materially

2   affect the terms and conditions of employment.'"  <u>Ferretti</u>, 2013

3   WL 140088, at *10 (quoting <u>Patten</u>, 134 Cal. App. 4th at 1387).

4        Next, plaintiff contends three "Needs Improvement"

5   ratings on her November 2013 evaluation constitute an adverse

6   employment action.  Not only were these ratings more favorable

7   than the "Area of Concern" and "Unsatisfactory" ratings,

8   plaintiff has not put forth any evidence suggesting that these

9   ratings materially affected the terms and conditions of her

10  employment.  The decision to reduce plaintiff's annual merit

11  increase was made the month prior to her evaluation and there is

12  no evidence suggesting that the performance evaluation

13  contributed to the decision to terminate plaintiff three months

14  later.  The "Needs Improvement" ratings on plaintiff's November

15  2013 employment evaluation do not rise to an adverse employment

16  action under California law.  <u>See</u> <u>Mueller v. City of Los Angeles</u>,

17  176 Cal. App. 4th 809, 822 (2d Dist. 2009) ("Matters such as

18  transferring employees, writing up employees, and counseling

19  employees are personnel matters.  'To exalt these exclusively

20  internal personnel disclosures with whistleblower status would

21  create all sorts of mischief.  Most damagingly, it would thrust

22  the judiciary into micromanaging employment practices and create

23  a legion of undeserving protected "whistleblowers" arising from

24  the routine workings and communications of the job site.'"

25  (quoting <u>Patten</u>, 134 Cal. App. 4th at 1385)).

26        Lastly, the written and verbal warnings plaintiff

27  relies on relate to Naify's accusation that plaintiff had stolen

28  a copy of her November 2013 performance evaluation before Naify

1   had finalized it.  (See generally Pl.'s Opp'n at 14:8-16:16.)

2   Not only is there no evidence suggesting that this incident

3   materially altered plaintiff's employment, such warnings and

4   internal personnel disputes do not constitute adverse employment

5   actions under California law.  See Mueller, 176 Cal. App. 4th at

6   822.

7            3.   Causal Link

8            "A 'causal link may be established by an inference

9   derived from circumstantial evidence, such as the employer's

10  knowledge that the [employee] engaged in protected activities and

11  the proximity in time between the protected action and allegedly

12  retaliatory [adverse] employment decision."  Ferretti, 2013 WL

13  140088, at *10 (quoting Morgan v. Regents of Univ. of Cal., 88

14  Cal. App. 4th 52, 69 (1st Dist. 2000)) (alterations in original).

15  "Essential to a causal link is evidence that the employer was

16  aware that the plaintiff had engaged in the protected activity."

17  Bowen v. M. Caratan, Inc., No. 1:14-CV-00397 LJO JLT, 2015 WL

18  6703584, at *18 (E.D. Cal. Nov. 2, 2015) (citing Morgan v.

19  Regents of Univ. of Cal., 88 Cal. App. 4th 52, 70 (1st Dist.

20  2000)).  "[F]or the purposes of causation, it is sufficient that

21  at least one of the persons responsible for making each adverse

22  employment decision had knowledge that Plaintiff had engaged in

23  protected activity."  Ferretti, 2013 WL 140088, at *10.

24           Although CRH contends that none of the CRH management

25  knew the contents of plaintiff's reports to DSS until this

26  litigation commenced, plaintiff has submitted sufficient evidence

27  giving rise to the inference that upper management at CRH knew or

28  at least suspected plaintiff reported misconduct to DSS.  For

41

example, plaintiff contends that in September 2013, Mesa, Gregg, and Naify called her into a meeting and questioned plaintiff about what she had told DSS.  (Second Canupp Decl. ¶ 31.)  After plaintiff told Mesa, Gregg, and Naify that DSS had interviewed her twice and that she had provided DSS with a copy of her notes, plaintiff claims she was "immediately chastised by all three women."  (Id.)  Plaintiff indicates that "[a]ll three women appeared visible [sic] upset and angry with [her] for providing [her] notes to licensing" and Naify told plaintiff that "she was not going to go down for this."  (Id.)  After the meeting, plaintiff claims she heard Gregg "yell across the hallway" to Santiago and tell Santiago that it "was funny how [plaintiff was the one to bring up these issues, and it was stupid, and [plaintiff] liked to start drama."  (Id. ¶ 32.)  This meeting occurred only one month prior to Naify's decision to reduce plaintiff's annual merit increase, which is sufficient for plaintiff to make a prima facie showing of a causal link between her reports to DSS and the decrease in her annual merit raise.

Ballard, who "authorize[d]" plaintiff's termination, indicates that he knew plaintiff was interviewed, but did not know she reported anything negative to DSS and thus did not terminate plaintiff because of any reports to DSS.  (Ballard Decl. ¶¶ 16, 23, 35 (Docket No. 25-5).)  However, CRH's Associate Director of Operations, Tina Glass, testified in her deposition that she believed Ballard was upset DSS was investigating CRH and that he blamed plaintiff for the investigation.  (Glass Dep. 34:6-35:6.)  Plaintiff also indicates that during a meeting on November 22, 2013 regarding the allegedly stolen performance

42

1   evaluation, Ballard asked plaintiff whether she "had a problem

2   with him and whether [she] was coming after him." (Second Canupp

3   Decl. 54.)  According to plaintiff, Ballard specifically

4   mentioned the accusations of sexual misconduct and "stated that

5   everything had been quiet before [plaintiff] was hired, and that

6   it seemed that [she] was always in the middle of something bad."

7   (Id.)  Plaintiff also claims Ballard told her "that it did not

8   look good that [she] was the one brining up problems" and that he

9   had heard that plaintiff had referred to herself as a

10  "whistleblower."  (Id.)  A triable issue therefore exists with

11  respect to whether Ballard knew or inferred that plaintiff had

12  reported negative information about CRH to DSS during her

13  interviews.

14        Defendant argues that the nine months between DSS's

15  interviews of plaintiff and CRH's termination of plaintiff defeat

16  any argument of causation based on a temporal connection.  The

17  Ninth Circuit has explained that "causation can be inferred from

18  timing alone where an adverse employment action follows on the

19  heels of protected activity," but has repeatedly found that

20  durations of four months and greater between the protected

21  activity and termination are too remote to support a finding of

22  causation based on temporal proximity.  Villiarimo v. Aloha

23  Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002) (citing

24  cases); see also Swan v. Bank of Am., 360 F. App'x 903, 906 (9th

25  Cir. 2009) (four months).

26        Plaintiff has submitted evidence showing that the

27  investigation was on-going throughout 2013.  Most significantly,

28  on January 14, 2014, DSS sent a five-page letter to CRH

43

1   indicating that "[c]itations have been issued" because the

2   investigation found that CRH had "violated requirements in the

3   operation of its group home." (Ballard Dep. Ex. MMM.) The

4   letter explained that the violations were based on CRH's "failure

5   to file serious incident reports" with DSS, specifically noting

6   that Ballard, Gregg, and Santiago "failed to report multiple

7   allegations of sexual and other inappropriate conduct by staff

8   towards clients at the facility." (Id. Ex. MMM at 1.) DSS noted

9   that this was a "serious deficiency" and issued a "Mandated Plan

10  Correction" that itemized twelve corrective actions CRH was

11  required to undertake. (Id. Ex. MMM at 2-4.) The letter also

12  informed CRH that DSS would monitor it over the next twelve

13  months to ensure compliance and perform "unannounced site

14  inspections." (Id. Ex. MMM at 4.)

15          At the same time, however, the letter memorializes that

16  "CRH's regulatory violations were previously discussed during a

17  Noncompliance Conference held on August 23, 2013 during which CRH

18  agreed to make specific corrections." (Id. Ex. MMM at 2.) CRH

19  had thus known since August 2013 that DSS's investigation had

20  resulted in findings of regulatory violations. Nonetheless,

21  taking all inferences in favor of plaintiff, a reasonable jury

22  could infer that upper management at CRH became increasingly

23  angered about plaintiff's reports to DSS upon realizing that it

24  was still facing repercussions for violations found four or five

25  months ago. It is also unclear from the evidence before the

26  court whether DSS had publically attributed blame to individual

27  upper management, including Ballard, before its January 14, 2014

28  letter. When considered in light of this timing of events,

1  plaintiff has made the requisite prima facie showing of a causal

2  link between the heightening of the DSS investigation and her

3  termination.  Cf. Yartzoff, 809 F.2d at 1376 (finding causation

4  based on proximity by evaluating the adverse employment actions

5  in relation to when the investigation prompted by the protected

6  activity was completed).

7                 4.   Legitimate, Non-Discriminatory Reason

8          Because plaintiff established a prima facie case of

9  retaliation, the burden "shifts to the employer to articulate

10 some legitimate, nondiscriminatory reason for the challenged

11 action." Chuang, 225 F.3d at 1123-24 (citing McDonnell Douglas,

12 411 U.S. at 802).  As previously discussed in the context of

13 plaintiff's FEHA claims, defendant had a legitimate, non-

14 discriminatory motive to terminate plaintiff because at the time

15 of her termination, she was unable to complete the essential

16 duties of her position with a reasonable accommodation.

17 Defendant has not, however, offered any satisfactory explanation

18 as to why Naify decided to reduce plaintiff's annual merit

19 increase or give plaintiff only 3% annual merit increase when

20 other employees received 4% or 5%.

21                5.   Pretext

22         With respect to defendant's decision to terminate

23 plaintiff, plaintiff "may establish pretext either by

24 persuading the court that a discriminatory reason more likely

25 motivated the employer or by showing that the employer's

26 proffered explanation is unworthy of credence." Ferretti, 2013

27 WL 140088, at *16.

28         Given the proximity in time between DSS's January 14,

2013 letter and plaintiff's termination, a jury could find that
CRH viewed plaintiff's medical conditions and anticipated
indefinite leave as an opportunity to terminate her in
retaliation for her reports to DSS.  Although the letter was
issued after CRH first calculated January 11, 2014 as the date
plaintiff's FMLA leave would expire, CRH had known of the
violations since August and Ballard had also participated in a
Mandated Plan of Correction meeting with DSS on December 20,
2013.  (Ballard Dep. Ex. MMM.)  A reasonable jury could find that
as of December 2013, CRH was learning that the violations were
not going to be easily resolved and blame was coming down on
individual executives, including Ballard.  Plaintiff has thus
submitted sufficient evidence to show that CRH was aware of
plaintiff's role in the on-going investigation before it decided
to retroactively count her August and September absences as FMLA
leave.  (See also Second Canupp Decl. ¶¶ 31-32; Gass Dep. 34:6-
35:6.)

Based on this evidence, a jury could find that CRH's
decision to retroactively count plaintiff's August and September
absences as FMLA leave and terminate her because of her inability
to resume working in the foreseeable future was pretext for its
desire to terminate her in retaliation for her reports to DSS.
Put another way, but for her reports to DSS that led to adverse
findings and citations against CRH and its upper management, CRH
may have extended additional leave time to plaintiff.

Moreover, prior to the damaging DSS investigation, CRH
had been generous in allowing plaintiff to take off work for her
medical conditions and allowed her to work from home.  There is

1  also circumstantial evidence giving rise to the inference that

2  CRH felt it could manage without plaintiff for a significant

3  duration.  Most notably, in an email to Ballard on December 11,

4  2013, Naify discussed coverage of plaintiff's duties and, in

5  light of CRH's ability to cover her responsibilities, questioned

6  whether her position was necessary:

> I just wanted to update you on Tina's absence.  We do
> not have a return date . . . . I have spoken with
> Norma and Rich, and Rich says he feels comfortable
> giving Katelin a $1/hour increase for covering the
> clinic. . . .
>
> I will be supervising all clinic staff.  I have spoken
> to Katelin about coverage for the head-to-toe exams,
> TB tests, and immunizations.  The interesting thing is
> that Katelin told me she can cover all of these things
> under Dr. Carson's license.  She already had him
> scheduled to come in 2 days a week and she thinks that
> is enough coverage. . . . This is interesting because
> it seems to me the clinic is set up to run without
> Tina, which begs the question, is that position
> needed?  We do need someone to supervise the clinic
> staff, but could that person simply be a supervisor?

18  (Oceguera Decl. Ex. 18.)  Although the FEHA, FMLA, or CFRA did

19  not require CRH to provide plaintiff with additional leave time

20  or allow plaintiff to work from home, the evidence is susceptible

21  to an inference that it would have made these generous allowances

22  if CRH management was not upset with her about her reports to

23  DSS.

24        Accordingly, because plaintiff has established a

25  triable issue of fact with respect to whether CRH retaliated

26  against her for her reports of misconduct to DSS by reducing her

27  annual merit raise and terminating her, the court must deny

28  defendant's motion for summary judgment on plaintiff's section

1102.5 claim.  Ultimately, the jury must determine whether CRH
terminated plaintiff in retaliation for her reports to DSS and,
if it did, whether it had a legitimate, independent reason to
terminate her.  See Cal. Lab. Code § 1102.6 ("In a civil action
or administrative proceeding brought pursuant to Section 1102.5,
once it has been demonstrated by a preponderance of the evidence
that an activity proscribed by Section 1102.5 was a contributing
factor in the alleged prohibited action against the employee, the
employer shall have the burden of proof to demonstrate by clear
and convincing evidence that the alleged action would have
occurred for legitimate, independent reasons even if the employee
had not engaged in activities protected by Section 1102.5.").

E.   Wrongful Termination in Violation of Public Policy and
     Injunctive Relief

Under California law, "[t]he elements of a claim for
wrongful discharge in violation of public policy are (1) an
employer-employee relationship, (2) the employer terminated the
plaintiff's employment, (3) the termination was substantially
motivated by a violation of public policy, and (4) the discharge
caused the plaintiff harm."  Nosal-Tabor v. Sharp Chula Vista
Med. Ctr., 239 Cal. App. 4th 1224, 1234-35 (4th Dist. 2015)
(internal quotation marks and citation omitted).  CRH concedes
that if plaintiff withstands summary judgment on her claims under
FEHA, FMLA, CFRA, or section 1102.5, she can withstand summary
judgment on her wrongful termination in violation of public
policy claim.  (See Def.'s Mem. at 36:21-37:2.)  Accordingly,
because plaintiff has shown that a genuine issue of material fact
exists on her FMLA, CFRA, and section 1102.5 claims, the court

1    must also deny CRH's motion for summary judgment on her wrongful

2    termination in violation of public policy claim.

3         F.    Injunctive Relief, Back Pay, and Front Pay

4              Having determined that CRH is entitled to summary

5    judgment in its favor on all of plaintiff's FEHA claims and her

6    more substantial FMLA and CFRA claims, CRH's motion for summary

7    judgment as to injunctive relief, back pay, and front pay is moot

8    as to those claims.  With the remaining claims that survived

9    summary judgment, it would be premature for the court to

10   determine what remedies plaintiff may seek when the parties do

11   not squarely address the remedies plaintiff is seeking and

12   entitled to under her remaining claims.  Accordingly, the court

13   will deny CRH's motion for summary judgment as to injunctive

14   relief, back pay, and front pay without prejudice to CRH raising

15   such arguments at trial.

16        G.    Affirmative Defenses

17             Plaintiff also moves for summary judgment on CRH's

18   affirmative defenses of after-acquired evidence, unclean hands,

19   good faith/bad faith, and undue hardship.  Plaintiff's motion for

20   summary judgment as to the first three affirmative defenses

21   centers around plaintiff's alleged misappropriation of Target

22   gift cards.  CRH gave plaintiff Target gift cards worth $400 on

23   August 7, 2013 to purchase supplies for the medical clinic.

24   (First Canupp Decl. ¶ 9.)  On the same day she received the

25   cards, plaintiff claims that she had left them in her truck at

26   CRH and her truck was broken into and the cards were stolen.

27   (Id. ¶ 14; Kelly Kluth Decl. ¶ 9.)  Plaintiff reported to CRH and

28   the Sacramento Police Department that the gift cards had been

1   stolen.  (First Canupp Decl. ¶ 15.)

2           About six months later when plaintiff was on leave in

3   February 2014,[10] another CRH employee was using her office and

4   found Target gift cards.  (Naify Dep. at 153:13-154:16.)  On

5   approximately February 5, 2014, CRH's accounting department

6   determined that the cards found in plaintiff's office were the

7   same cards plaintiff had reported as stolen.  (Ryan Dep. at

8   28:21-14, 30:8-31:14, 31:25-32:11, 59:24-63:2, Ex. OOOO; Kluth

9   Decl. ¶ 13.)  CRH also determined that the entire balance on the

10  gift cards had been used on the day they were given to plaintiff.

11  (Kluth Decl. ¶ 12.)  CRH contends that it was not able to

12  complete its investigation into plaintiff's alleged

13  misappropriation of the gift cards because she was on leave when

14  the gift cards were discovered in her office.  (Second Ballard

15  Decl. ¶ 6 (Docket No. 42-2).)[11]  According to CRH, if plaintiff

16      [10]   It is unclear from the evidence exactly when the Target
17  gift cards were found.  (Compare Gregg Dep. at 64:10-65:23
    (testifying that he does not recall when the Target gift cards
18  were found, but that it might have been summer or fall 2013),
    with Naify Dep. at 153:13-154:16 (testifying they were found in
19  February 2014).)  Taking the evidence in the light most favorable
    to CRH, the court infers for purposes of this motion that they
20  were found in February 2014.

21      [11]   Plaintiff objects to the court's consideration of this
22  paragraph of Ballard's declaration.  Although the paragraph may
    contain other objectionable evidence, the court relies on the
23  paragraph only for Ballard's explanation as to CRH's inability to
    interview plaintiff while she was on leave and intent to
24  interview her when she returned.  As the executive director of
    CRH, the court finds that Ballard has sufficient personal
25  knowledge to testify to this issue for purposes of opposing
    plaintiff's motion for summary judgment and that this evidence is
26  not otherwise objectionable.

27          Plaintiff also raises five other objections to evidence
    defendant submitted in opposition to plaintiff's motion for
28  summary judgment.  (See Docket No. 58.)  Because the court does

1  did not have a legitimate and plausible explanation about the

2  Target gift cards when she returned from FMLA leave, CRH would

3  have terminated her.  (Id.)

4              1.   After-Acquired Evidence

5              "The doctrine of after-acquired evidence refers to an

6  employer's discovery, after an allegedly wrongful termination of

7  employment or refusal to hire, of information that would have

8  justified a lawful termination or refusal to hire."  Salas v.

9  Sierra Chem. Co., 59 Cal. 4th 407, 428 (2014).  In Salas, the

10 California Supreme Court explained that "allow[ing] such after-

11 acquired evidence to be a complete defense would eviscerate the

12 public policies embodied in the FEHA by allowing an employer to

13 engage in invidious employment discrimination with total

14 impunity."  Id. at 430 (discussing McKennon v. Nashville Banner

15 Publ'g Co., 513 U.S. 352 (1995)).  The Court concluded that while

16 it could not serve as a complete defense, the employee's remedies

17 generally "should not afford compensation for loss of employment

18 during the period after the employer's discovery of the evidence

19 relating to the employee's wrongdoing."  Id. at 431.

20             While plaintiff recognizes that this defense could be

21 relevant to her claims, she points out that, "[b]y definition,

22 after-acquired evidence is not known to the employer at the time

23 of the allegedly unlawful termination or refusal to hire."  Id.

24 at 430.  Here, just over one week before terminating plaintiff,

25 CRH discovered the used gift cards in plaintiff's office and

26 determined that they were the same gift cards she had reported

27 ───────────────────────────────────────────────────────────

28 not rely on any of this evidence, the court overrules those
   objections as moot.

                              51

1    stolen.  Relying on Peterson v. Nat'l Sec. Techs., LLC, CRH

2    contends that the after-acquired evidence doctrine nonetheless

3    remains viable because it could not have interviewed plaintiff to

4    complete its investigation and determine whether to terminate her

5    for misappropriating the gift cards while she was on FMLA leave.

6    No. 12-CV-5025-TOR, 2013 WL 1758857, at *1 (E.D. Wash. Apr. 24,

7    2013).

8         In Peterson, the employer made the decision to

9    terminate the plaintiff while an investigation into unrelated

10   misconduct was on-going, and the misconduct under investigation

11   did not play a part in the employer's decision to terminate the

12   plaintiff.  Id. at *2.  The Peterson court determined that the

13   employer's knowledge of the allegations of misconduct prior to

14   its decision to terminate plaintiff did not preclude the employer

15   from relying on the after-acquired evidence defense because the

16   employer's investigation was still on-going and it did not yet

17   "know" whether the plaintiff had engaged in the misconduct under

18   investigation.  Id. at *10-11.  The court emphasized that the

19   employer "began its investigation promptly upon learning of the

20   alleged misconduct" and it was "not a case in which Defendant had

21   'reason to know' of the independent misconduct and simply failed

22   to take action until after the plaintiff was fired."  Id. at *11.

23        Here, while plaintiff suggests that some CRH employees

24   thought plaintiff should not have left the gift cards in her car,

25   CRH did not discover the gift cards in her office until February

26   2014 and it promptly investigated and determined that they were

27   the gift cards that plaintiff had previously reported as stolen.

28   CRH has established a triable issue of fact that it intended to

1    interview plaintiff as part of its investigation, that it was
2    waiting for plaintiff to return from FMLA leave to conduct that
3    interview, and that it would have terminated plaintiff if it
4    determined she had misappropriated the Target gift cards.

5           Under these circumstances and given that the
6    after-acquired evidence defense is an equitable defense that
7    requires the court to "balance[] the public policy interest in
8    eliminating unlawful discrimination against the equitable
9    principle that an employer should not be held liable for damages
10   when the employee invokes the aid of the court with unclean
11   hands," Rivera v. NIBCO, Inc., 364 F.3d 1057, 1071 (9th Cir.
12   2004), the court will deny plaintiff's motion for summary
13   judgment on CRH's after-acquired evidence defense.  Cf. McKennon,
14   513 U.S. at 361 ("The proper boundaries of remedial relief in the
15   general class of cases where, after termination, it is discovered
16   that the employee has engaged in wrongdoing must be addressed by
17   the judicial system in the ordinary course of further decisions,
18   for the factual permutations and the equitable considerations
19   they raise will vary from case to case.").

20          2.   Unclean Hands

21          "Generally, the equitable doctrine of unclean hands
22   applies when a plaintiff has acted unconscionably, in bad faith,
23   or inequitably in the matter in which the plaintiff seeks
24   relief."  Salas, 59 Cal. 4th at 432. "The misconduct which brings
25   the clean hands doctrine into operation must relate directly to
26   the transaction concerning which the complaint is made, i.e., it
27   must pertain to the very subject matter involved and affect the
28   equitable relations between the litigants."  Id. (internal

1  quotation marks and citation omitted).  It is undisputed that

2  plaintiff's alleged misappropriation of the Target gift cards did

3  not relate directly or have any relevance to CRH's calculation of

4  her FMLA and CFRA leave or CRH's alleged termination of plaintiff

5  in retaliation for her having reported sexual misconduct by CRH

6  staff to DSS.  Accordingly, because a triable issue does not

7  exist on this affirmative defense, the court will grant

8  plaintiff's motion for summary judgment on CRH's unclean hands

9  defense.

10          3.   Good Faith/Bad Faith and Undue Hardship

11          Lastly, CRH's affirmative defenses of good faith/bad

12  faith and undue hardship appear limited to plaintiff's FEHA

13  claims and, because the court will grant summary judgment in

14  favor of CRH on those claims, it will deny plaintiff's motion for

15  summary judgment on those affirmative defenses as moot.

16          IT IS THEREFORE ORDERED that defendant's motion for

17  summary judgment be, and the same hereby is:

18          (1) GRANTED with respect to plaintiff's FEHA claims

19  under subsections 12940(a), (m), and (n);

20          (2) DENIED with respect to plaintiff's FMLA and CFRA

21  entitlement claims based on the denial of her full entitlement to

22  twelve weeks of leave and GRANTED with respect to plaintiff's

23  FMLA and CFRA retaliation and reinstatement claims;

24          (3) DENIED with respect to plaintiff's section 1102.5

25  retaliation claim;

26          (4) DENIED with respect to plaintiff's termination in

27  violation of public policy claim; and

28          (5) DENIED AS MOOT with respect to plaintiff's request

1   for injunctive relief, back pay, and front pay.

2            IT IS FURTHER ORDERED that plaintiff's motion for

3   summary judgment be, and the same hereby is:

4            (6) DENIED with respect to her FEHA claim under

5   subsection 12940(n) and defendant's affirmative defense of after-

6   acquired evidence;

7            (7) GRANTED with respect to defendant's affirmative

8   defense of unclean hands; and

9            (8) DENIED AS MOOT with respect to defendant's

10  affirmative defenses of good faith/bad faith and undue hardship.

11  Dated:  April 20, 2016

12                              WILLIAM B. SHUBB

13                              UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28